**SO ORDERED.**

**SIGNED this 13 day of June, 2008.**

_____

**Randy D. Doub**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILSON DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **MARIFDARR, INC.** | **08-00339-8-RDD** |
|     **DEBTOR** | |

| | |
|---|---|
| **BUSINESS LOAN CENTER, LLC** | |
|     **Plaintiff** | **ADVERSARY PROCEEDING NO.** |
|     **v.** | **08-00007-8-RDD-AP** |
| **MARIFDARR, INC., MUHAMMAD ARIF DARR, AND FARRAH ARIF DARR** | |
|     **Defendants** | |

| | |
|---|---|
| **BLX CAPITAL, LLC** | |
|     **Plaintiff** | **ADVERSARY PROCEEDING NO.** |
|     **v.** | **08-00008-8-RDD-AP** |
| **MARIFDARR, INC., MUHAMMAD ARIF DARR, AND FARRAH ARIF DARR** | |
|     **Defendants** | |

## ORDER ALLOWING MOTION TO DISMISS

This adversary proceeding is before the court on the Plaintiff's motion to dismiss the counterclaims of the defendants pursuant to Federal Rule of Civil Procedure 12(b)(6), incorporated by Bankruptcy Rule 7012(b).  A hearing was held in Wilson, North Carolina on May 21, 2008.

This court has jurisdiction over the parties and subject matter of these proceedings pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) which this court may hear and determine.

Defendant, Marifdarr, Inc.("Marifdarr"), filed a petition for relief pursuant to chapter 11 of the Bankruptcy Code on January 17, 2008.  Prior to Marifdarr's filing, state court actions had been commenced by Business Loan Center, LLC ("BLC") and BLX Capital, LLC ("BLX") against the defendants.  Those matters were removed from the state court to the bankruptcy court by Marifdarr on January 18, 2008.

The defendants' response to the plaintiffs' actions included counterclaims against the plaintiffs, alleging causes of action for fraud and misrepresentation, breach of fiduciary duty and constructive fraud, negligent misrepresentation, general breach of contract, unjust enrichment, intentional infliction of emotional distress, unfair and deceptive trade practices pursuant to Chapter 75 of the North Carolina General Statues, and violations of the Federal Racketeer Influenced and Corrupt Organizations Act (RICO).  In response, the plaintiffs filed the pending motion to dismiss the defendants' counterclaims pursuant to Rule 12(b)(6), which requires dismissal of a pleading when the pleading fails "to state a claim upon which relief can be granted."

Although the plaintiffs' motion was one to dismiss pursuant to Rule 12(b)(6), because the court considered matters outside the defendants' counterclaim, namely the documents stipulated by

the parties for admission for the court's consideration and the parties' briefs and arguments regarding matters outside the facts alleged in the counterclaim, including the plaintiffs' affirmative defenses raised in its reply to the counterclaim, the court will treat this motion as one for summary judgment pursuant to Federal Rule of Civil Procedure 56.

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In making this determination, conflicts are resolved by viewing all facts and all reasonable inferences in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994 (1962). Because there is no genuine issue of material fact in this matter, and the issue to be decided is a matter of law, a ruling on the motion for summary judgment is appropriate in this matter.

For purposes of this motion, the court will accept the facts as set forth in the defendants' counterclaim as true. Plaintiff BLX, after foreclosing on a hotel property in Goldsboro, North Carolina, sent a loan commitment letter to defendant, Muhammad Arif Darr, on May 13, 2004 regarding the terms of a loan which would allow Mr. Darr to purchase the foreclosed hotel property. The terms of that letter provided that Mr. Darr was approved for a loan of $1,235,000.00. Counterclaim Exhibit 1. $1,035,000.00 of the loan was to be used for purchase of the property and $200,000.00 of the loan was to be used for renovation of the property. This letter also provided a condition that Mr. Darr would provide evidence of a $165,000.00 equity capital contribution by him prior to closing. This letter was not contingent upon Small Business Administration ("SBA") approval.

3

On June 11, 2004, BLX and Mr. Darr entered into a contract for the purchase of the hotel property for $1,100,000.00.  On July 15, 2004, Mr. Darr and BLC Real Estate, LLC entered a lease agreement for the hotel property beginning on July 15, 2004 and ending on October 15, 2004 or on the date of closing, whichever first occurred.  This lease allowed Mr. Darr to have access to the property to begin renovations.  The lease agreement revised the terms of the original loan commitment letter between BLX and Mr. Darr to increase the loan amount to $1,335,000.00 to reflect an increase of $100,000.00 for renovation funds.  This loan commitment was not contingent upon SBA approval.

On September 13, 2004, BLX and Mr. Darr entered into an additional loan agreement confirming the revised loan amount of $1,335,000.00 and indicating that the loan was subject to SBA approval.[1]

Mr. Darr alleges that he contributed $165,000.00 to the hotel property between July 2004 and October 2004.  Based upon BLX's claim of the disapproval of the loan to Mr. Darr by the SBA, Mr. Darr entered into another loan commitment on November 2, 2004.  That letter indicated that the total loan amount would be $1,100,000.00, all of which would be used for the purchase price of the property.

In March 2005, the loan from BLX to Mr. Darr for purchase of the hotel property closed.  Mr. Darr accepted the loan proceeds and ownership of the property.  Soon after closing, Mr. Darr defaulted on the loan and requested forbearances.  The first forbearance agreement was entered on November 16, 2005. BLC Complaint Exhibit G1; BLX Complaint Exhibit E1.  Mr. Darr signed that

---

[1] Although this letter was referred to in the defendants' counterclaim and was accepted as true by the plaintiffs for purposes of this hearing, this letter was not produced by either party.

agreement in exchange for reduction in payments, extensions and a forbearance on default. However, Mr. Darr struck through certain provisions in the agreement, including a full release of all claims between the parties. Although Mr. Darr indicates that he was represented by counsel in the negotiation of the agreement, he indicates that he signed the agreement under duress.

On December 12, 2005, after defaulting under the terms of the first forebearance agreement, Mr. Darr signed a second forebearance agreement. BLC Complaint Exhibit G2; BLX Complaint Exhibit E2. He again struck through several sections of the agreement, but left in the sections regarding the release of claims between the parties, his representation by counsel, and that the agreement was not signed under duress.

On May 27, 2006, Mr. Darr signed a third forebearance agreement, striking through language releasing his rights under bankruptcy, but again leaving in the release language and making no indication that the agreement was signed under duress. BLC Complaint Exhibit G3; BLX Complaint Exhibit E3.

After defaulting again, the defendant signed allonges to the notes on December 14, 2006, which contained the language:

> WHEREAS, BORROWER AND GUARANTORS EACH, AND ANY COMBINATION AND COLLECTIVELY, HEREBY FULLY AND FOREVER REMISE, RELEASE AND DISCHARGE LENDER, AND THEIR OFFICERS, AGENTS AND EMPLOYEES, OF AND FROM ANY AND ALL CLAIMS AND FROM ANY AND ALL OTHER MANNER OF ACTION AND ACTIONS, CAUSE OR CAUSES OF ACTION, RIGHTS, CLAIMS, COUNTERCLAIMS, DEFENSES, SUITS, SET OFFS, DEBTS, DUBS, SUMS OF MONEY, ACCOUNTS, COVENANTS, CONTRACTS, CONTROVERSIES, OBLIGATIONS, LIABILITIES, AGREEMENTS, PROMISES, VARIANCES, TRESPASSES, DAMAGES, JUDGMENTS, LIENS, CLAIMS OF LIEN, LOSSES, COSTS, EXPENSES, JUDGMENT BONDS, EXECUTION AND DEMANDS OF EVERY NATURE AND KIND WHATSOEVER, IN LAW AND IN EQUITY, EITHER NOW, ACCRUED OR HEREAFTER MATURING, WHICH ANY OF THEM HAD, MAY HAVE HAD, OR NOW HAVE, OR CAN, SHALL OR MY

> HAVE, FOR OR BY REASON OF ANY MATTER, CAUSE OR THING
> WHATSOEVER, TO AND INCLUDING THE DATE HEREOF ARISING OUT OF
> OR CONNECTED IN ANY WAY WITH THE INSTRUMENTS REFERENCED
> IN THE RECITALS, LENDER'S, AND/OR THEIR AGENTS' CONDUCT AND
> ACTIONS WITH RESPECT THERETO AND LENDERS GENERAL BUSINESS
> RELATIONSHIP WITH ANY OF THEM, INCLUDING, BUT NOT LIMITED TO,
> THE NEGLIGENCE OF LENDER; PROVIDED, HOWEVER, LENDER IS NOT
> RELEASED FROM ITS OBLIGATIONS UNDER THIS AGREEMENT.

Mr. Darr also signed a deferral agreement with BLC on December 14, 2006, in which was stated,

"The Borrower and Guarantors further acknowledge the validity and enforceability of the subject

Loan Documents and that they have no claim or defense against the Lender in connection therewith

which would in any way affect their liability thereunder." BLC Complaint Exhibits G4 and G5;

BLX Complaint Exhibit E4.

After defaulting again, Mr. Darr signed more allonges to the notes on March 13, 2007,

containing the same release language as the December 14, 2006 allonge. BLC Complaint Exhibit

G6; BLX Complaint Exhibit E5. In October 2007, after numerous defaults and agreements with the

defendants, the plaintiffs filed suits within one week of each other against the defendants.

At the hearing, counsel for the plaintiffs explained that there are no allegations in the

defendants' counterclaim to support their causes of action. Counsel argues that the cause of action

for fraud and misrepresentation is insufficiently plead pursuant to Federal Rule of Civil Procedure

Rule 9 as there are no allegations of the plaintiffs' intent not to perform at the time the agreements

were entered. With respect to alleged misrepresentations to which the defendants refer in their

counterclaim, Rule 9 requires that the party making the misrepresentation on behalf of a corporation

be identified.

Counsel argues that negligent misrepresentation is not actionable in this case because the defendants' cause of action relies upon omissions by the plaintiffs.  The state of North Carolina does not recognize negligent omission as a cause of action, unless there is a duty between the parties for disclosure.  In this case, counsel argues there is no such duty.

Counsel argues that the cause of action for breach of fiduciary duty fails as there is no fiduciary relationship in this case which would give rise to such a duty.  There are no known cases which recognize a fiduciary relationship between an SBA lender and a borrower, as alleged in the counterclaim.

As to the defendants' breach of contract claims, counsel indicates that the causes of action based upon the lease between Mr. Darr and BLC Real Estate is not actionable, as BLC Real Estate is not a party to this action.  Further, under the revised agreements and note between the parties, Mr. Darr accepted the benefits of the new agreements.  Finally, the defendants are now relying upon a theory that the contracts between the parties are void as against public policy, which would render the breach of contract claims moot.

As to the unjust enrichment claim of the defendants, counsel argues that this claim fails because of the express contracts between the parties.  Unjust enrichment is an equitable concept that applies only in the absence of an express agreement between the parties.

Counsel argues that the defendants' claim for intentional infliction of emotional distress fails because the facts of this case do not remotely rise to the facts required for such a claim in North Carolina.

The defendants' claims pursuant to Chapter 75 of the North Carolina General Statutes are based upon the same allegations on which they base their fraud action.  Because the defendants'

7

claim for fraud must fail for failure to plead with specificity, so too must the Chapter 75 claims, counsel for the plaintiffs argues.

Counsel for the plaintiffs indicates that the allegations in the counterclaim do not fulfill the requirements of a pattern necessary to establish a RICO claim, as established by the Fourth Circuit. Because this case revolves around only one transaction, one property, a limited number of "victims" and a short time frame, it fails to meet the 5-factor test established by the Fourth Circuit. Counsel further argues that the allegations in the counterclaim fail to meet the specificity required for setting forth predicate acts.

Counsel for the plaintiffs concluded his argument by indicating that, even if the claims were sufficient on the face of the complaint, the multiple releases signed by the defendants make the case subject to dismissal pursuant to Maco Homes, Inc. v. Branch Banking & Trust Company (In re Maco Homes, Inc.), 96 F.3d 1439, 1996 WL 511494 (4th Cir. (N.C.) 1996).

Counsel for the defendants acknowledged that the defendants have changed their theory regarding the case from one of breach of contract to one of fraud. Counsel indicated that the defendants now consider the contracts with the plaintiffs to be void as against public policy because they were used to further a fraudulent scheme conducted by the plaintiffs.

Counsel acknowledged that the defendants probably had a cause of action against the plaintiffs when they refused to honor their original agreement with the defendants based upon a rejection of the loan by the SBA. However, Mr. Darr felt compelled to remain in negotiations with the plaintiffs because of the time, money and effort he had already invested in the hotel property.

Counsel for the defendants argues that the defendants did plead fraud with the requisite specificity pursuant to Rule 9, as a strict application of Rule 9 may be relaxed under circumstances

8

in which the facts necessary to support the claim are strictly within the opposing party's control. Counsel indicates that the plaintiffs are liable for fraud because they made representations that they would honor the original loan commitment with Mr. Darr without a contingency on SBA approval. Thereafter, the plaintiffs approached the SBA about insuring the loan, and refused to honor the agreement with Mr. Darr when the SBA refused to insure the loan.  Counsel argues that this indicates the plaintiffs intent not to loan the money without SBA approval when they represented otherwise to Mr. Darr.

As to the defendants' cause of action for breach of fiduciary duty, counsel for the defendants acknowledges that a fiduciary relationship does not normally arise within the context of a debtor-creditor relationship.  However, counsel indicates that this situation is unusual because of the SBA's participation and the plaintiffs' status with the SBA.  This relationship between the plaintiffs and SBA takes this situation out of the normal debtor-creditor relationship.

Counsel for the defendants argues that a cause of action for intentional infliction of emotional distress would be actionable under these circumstances.  Counsel refers to the case of Stanbeck v. Stanbeck, where the court held that a husband's action which resulted in the foreclosure of his wife's house was sufficiently outrageous to constitute intentional infliction of emotional distress.

Counsel for the defendants withdrew the defendants' cause of action for breach of contract, as he indicates that the contracts are a legal nullity.  However, he argues that, since the contracts between the parties are void as against public policy, the defendants' action for unjust enrichment is a valid one.

Finally, counsel for the defendants indicates that the releases, which were part of the contracts between the parties, would also be void as against public policy, since they too constituted part of the plaintiffs' fraudulent scheme.  Based on this fraudulent scheme, counsel for the defendants acknowledged that the defendants' strongest causes of action are for unfair and deceptive trade practices and RICO violations.

Counsel for the defendants argues that this case is a quintessential RICO case, even under the high bar set by the Fourth Circuit.  This case involves a national scheme by the plaintiffs and their affiliates to churn properties.  Counsel urges the court to take judicial notice that this scheme has been going on nationally, based upon the indictments of some agents of the plaintiffs and Congressional hearings held regarding such schemes.

Counsel for the plaintiffs argues that, had there been a scheme involved to defraud Mr. Darr out of the money which he had invested in the property, the plaintiffs would have foreclosed upon the property at Mr. Darr's first default.  Instead, the plaintiffs entered into numerous forbearance agreements, allonges, and deferral agreements with Mr. Darr over a period of approximately two years before seeking relief from the courts.

Based upon the pleadings and the arguments of counsel, the issue before the court centers on whether the contracts between the parties, and the releases contained therein, are valid, or whether they are void as against public policy, having been induced by the plaintiffs within the context of a fraudulent scheme.  If the contracts, and therefore the releases, are valid, the Fourth Circuit in Maco Homes, Inc. v.Branch Banking & Trust Company, Inc. (In re Maco Homes, Inc.), 96 F. 3d 1439, 1996 WL 511494 (4th Cir. 1996) (unpublished opinion) has determined that a release will constitute a valid defense against claims raised by the defendants, thus defeating the defendants'

counterclaim. However, if the contracts are determined to be part of a fraudulent scheme, thereby being induced by fraud and duress, the releases contained therein would be invalid, and those claims sufficiently plead within the counterclaim shall stand.

As proffered by counsel for the defendants at the hearing of this matter, the defendants allege that the plaintiffs are involved in a nation-wide scheme to defraud purchasers of foreclosed properties by continuously "churning" properties. This scheme is advanced by the plaintiffs' foreclosing upon properties, inflating the purchase price of the property, requiring potential purchasers to invest their own funds into the renovation of the property while inducing them into a loan commitment for the purchase price of the property, allowing the purchaser to default upon the terms of the loan, and ultimately foreclosing upon the property again, reaping the benefits of the amounts invested by the purchaser. Because the purchaser has invested money in the property prior to the filing of the loan closing, the purchaser enters into a less beneficial loan commitment than originally offered by the plaintiffs, induced by the emotional duress caused by the options of either renegotiating the loan commitment or walking away from the time, effort and money already invested.

The plaintiffs counter that the defendants were not under emotional duress at the time of the renegotiation of the loan commitment or at the time of the execution of the various forbearance agreements, deferrals and alloinges, as the defendants could have chosen to pursue legal action against the plaintiffs at any time for the alleged breach of the initial loan commitment. The defendants, however, chose not to do so, but to continue their relationship with the plaintiffs, voluntarily executing the various agreements between the parties.

11

In <u>Maco</u>, the Fourth Circuit considered facts very similar to those before this court.  In that case, the borrower signed several forbearance agreements with two financial institutions, all of which contained language releasing the financial institutions from any and all claims.  Upon defaulting on the forbearance agreements, the borrower was obligated to transfer properties to the financial institutions in lieu of foreclosures.  Instead, the borrower filed suit against the financial institutions in state court, which were ultimately removed to the bankruptcy court upon filing by the borrower, alleging that the releases within the forbearance agreements were unenforceable because the agreements were signed under duress and as a result of the fraud of the financial institutions.

As to the borrower's claim of duress, the Court found that

> Economic duress arises from the illegitimate use of economic power outside the bounds of a contract or the law.  Thus, the mere threat by one party to breach a contract, though wrongful, does not establish economic duress.  Economic duress occurs when a party's wrongful action forces another to make a contractual promise, or else suffer irreparable injury to his business.  In addition, the wronged party must have 'no immediate and adequate remedy in the courts' that would enable him to resist the other's demands.

<u>Id.</u> at *4.  The Court determined that the borrower had options other than signing the agreements containing the releases, including the option ultimately taken of filing bankruptcy.  The Court also determined that the financial institutions were not wrong to threaten foreclosure at the time the agreements were entered, as the institutions had the legal right to pursue foreclosure at that time. <u>Id.</u> at *4.

As to the borrower's claim of fraud, the Court found that, although the financial institutions' actions may have risen to the level of fraud, the releases contained within the agreements signed by the borrower released the financial institutions from a claim of fraud.  As to the borrower's argument that it entered the agreements as a result of the fraud of the financial institutions, the Court found

no inducement as the borrower had participated in the negotiation of the agreements and had made revisions to the agreement. Further, the borrower was represented by counsel with regard to the agreements. Id. at *5.

In this case, as in Maco, the defendants had the remedy of filing a cause of action against the plaintiffs upon the plaintiffs' failure to abide by the original loan commitment, but the defendants failed to do so. Thereafter, the defendants signed numerous documents containing release language, which would release the plaintiffs of all claims. Although the defendants indicate these releases were signed under duress, the defendants did mark through the release language in the first forbearance agreement of November 16, 2005, which was also signed by a representative of the plaintiff. Thereafter, the defendants left the release language intact in the December 12, 2005 forbearance agreement, the May 27, 2006 forbearance agreement, the December 14, 2006 allonge, and the March 13, 2007 allonge, while either marking through other language within the agreements or signing the agreements as written. This indicates that the defendants understood their ability to alter the contract. Further, the defendants acknowledged within the agreements that they had been represented by counsel in the negotiations of the documents. Had the plaintiffs been acting in furtherance of a scheme to "churn" the property, they certainly would not have negotiated an additional three forbearance agreements with the release language after the defendants defaulted on the forbearance agreement dated December 12, 2005.

In the case of Wells v. Entre Computer Centers, Inc., 915 F.2d 1566, 1990 WL 146981 (4th Cir. 1990), the Fourth Circuit addressed whether a release may be found to be invalid because it was obtained as "part and parcel of a RICO conspiracy." Although the Court did not discuss in detail the circumstances under which a release might be deemed invalid under this theory, it did state that

13

". . . it is enough to say that, whether or not a future case may provide an opportunity for a court to invalidate releases on the ground that they were an *integral* part of a RICO conspiracy, '[t]his case has not ushered in that day.'" Id. at *6 (emphasis added) (citations omitted) (unpublished opinion). As in Wells, there is no evidence in this case which indicates that the releases signed by the defendants in the forbearance agreements in this case form an *integral* part of the RICO conspiracy complained of in the counterclaim.

Based on the foregoing, the court finds that the various forbearance agreements and allonges containing the release of claims between the parties are valid.  Therefore, the releases contained within those agreements are an affirmative defense of any and all claims which the defendants may have against the plaintiffs.  For that reason, the plaintiffs' motion for summary judgment against the defendants' claims set forth in the defendants' counterclaims is **ALLOWED** and the defendants' counterclaims are **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

**END OF DOCUMENT**